Filed 2/5/14  P. v. Mendoza CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VINCENT RAY MENDOZA,<br><br>    Defendant and Appellant. | 2d Crim. No. B247144<br>(Super. Ct. No. 2009009533)<br>(Ventura County) |

Vincent Ray Mendoza appeals the judgment entered following a court trial in which he was convicted of continuous sexual abuse of a child under the age of 14 (Pen. Code,[1] § 288.5) and two counts each of committing a lewd act on a child (§ 288, subd. (a)), luring (§ 288.3, subd. (a)), and misdemeanor child molestation (§ 647.6, subd. (a)).[2] Appellant was sentenced to 30 years in state prison.  He contends the evidence is insufficient to support his conviction for continuous sexual abuse.  We affirm.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] The trial court struck allegations that appellant committed lewd and lascivious acts against more than one victim (§ 667.61, subd. (e)(4)), and that one of his victims was under the age of 14 (§ 1203.066, subd. (a)(8)).

## FACTS AND PROCEDURAL HISTORY

Appellant's niece D. was born in 1994. When D. was between the ages of five and seven, appellant touched her inappropriately on numerous occasions. The incidents occurred while D. was staying with her grandmother T., who is appellant's mother. On 10 to 20 different occasions, appellant took D. into the bathroom, pulled her pants and underwear down to her knees, and touched her vagina and buttocks. Appellant also took off his pants and underwear. On a couple of times, appellant took D.'s hand and placed it on his penis. He told D. not to tell anyone about the incidents.

As D. got older, she tried to avoid appellant and wore non-revealing clothing when she saw him. During this time, appellant would call D. on her cell phone and tell her that he wanted to see her again so he could touch her.

Appellant also sexually abused D.'s younger sister M. When M. was seven or eight years old, appellant began making comments about touching her vagina and asked her if he could do so. He also asked M. if she had boyfriends and whether she let them touch her. On one occasion, M. and appellant were sitting on the couch when he pulled her over and touched her vaginal area over her clothing for several minutes. On another occasion, appellant reached under M.'s clothes and touched her vaginal and chest areas. M. yelled at appellant to stop, and he told her not to yell at him. Appellant subsequently called M. and told her not to tell her parents what he had done. During the same period, appellant would call M. and ask when he could see her and touch her again.

Appellant continued calling D. at her home for several years, asking if he could see her. When D. entered the ninth grade, appellant began calling her on her cell phone and asking if he could see her and "touch [her] down there." He also asked whether she wore a bra and had "hair down there."

D. reported the abuse to her mother in November 2008. D.'s mother asked M. if appellant had also touched her, and she verified that he had. D.'s parents confronted appellant about the abuse.

Prior to appellant's arrest, D. made a phone call to him that was surreptitiously recorded by the police. During the call, appellant apologized for touching

2

D. and acknowledged that he "touch[ed her] vagina" on four or five different occasions. Appellant also acknowledged molesting M. and "put[ting his] finger in her vagina." Appellant admitted that he knew his conduct was wrong. He also admitted that he tried to touch D. and M.'s younger sister R., but she "wouldn't let" him do so.

When appellant was interviewed by the police following his arrest, he admitted touching D.'s vagina on three or four different occasions while they were in the bathroom at his mother's house. He also admitted touching M.'s vagina three or four times in the same manner. Appellant further acknowledged exposing his penis to a neighborhood girl on four or five different occasions. Appellant said he had reported the abuse to his brother, who is D. and M.'s father, and told him "I know it's a sin and I know it's foolish and it's stupid."

Appellant admitted to the police he had been sexually excited by his victims' pre-pubescence. He also said he was able to distinguish between adults and children with regard to his sexual desires, and knew it was wrong to molest children.

Several months after appellant pled not guilty to the charges, his attorney declared a doubt regarding his competency. Three doctors were appointed to evaluate appellant pursuant to section 1368. Following a hearing, the court found appellant to be competent and set the matter for a preliminary hearing. After defense counsel once again declared a doubt as to appellant's competency, the court appointed a doctor to reevaluate appellant. The court also received a report from appellant's treating psychiatrist, Dr. David Gudeman. After considering the doctors' reports, the court found appellant incompetent to stand trial and suspended the proceedings pending appellant's treatment at Patton State Hospital. About four months later, appellant was declared competent to stand trial in accordance with a certificate of restoration of his mental competence (§ 1372). The matter was set for trial and appellant waived his right to a jury.

The parties stipulated that the evidence at trial would consist of the victims' recorded police interviews, the recording of D. and appellant's phone call, the police reports, other extrajudicial statements made by the victims, and neuropsychiatric evaluations commissioned by the defense. The evaluations recounted that appellant had

3

suffered a traumatic brain injury in 1982 as the result of a motor vehicle accident that occurred while he was driving under the influence of alcohol. Appellant was in a coma for two months after the accident and required years of rehabilitation. He is permanently disabled as a result of his injuries and cannot live independently. When he was evaluated on February 10, 2010, he was able to identify current events and facts and recited numerous details about his childhood and adult history before and after the accident.

With regard to appellant's cognitive presentation, it was reported that he "was able to comprehend all the directions provided and worked collaboratively throughout the evaluation. He asked questions when he did not fully understand the task and would request to have the evaluator slow down if he felt rushed while making his responses. He was able to quickly switch tasks and was very compliant." Although "[h]is thought processes were generally linear, coherent and goal-directed . . . [, h]e demonstrated signs of executive dysfunction including some disinhibition, impulsivity and inattention." His intellectual functioning was "in the borderline impaired range." Appellant's I.Q. was 75, which "is only a few points higher that the Mentally Retarded range" and "reflects a dramatic decline from an estimate of his premorbid abilities which was in the average range." It was also noted that appellant "demonstrated limited insight and a lack of concern of the consequences of his upcoming legal proceedings."

The evaluators ultimately concluded that appellant "demonstrated significant neurocognitive compromise and meets the criteria for dementia associated with traumatic brain injury (ICD 290.0)." The evaluators further concluded that appellant "does not have the neurocognitive capacity to safely function in the prison system. If [appellant] is sentenced, we strongly urge the court to consider [appellant's] safety and recommend his placement in a medically-oriented rehabilitative setting rather than the general prison population." Another psychiatrist who evaluated appellant on October 30, 2009, concluded that he "is not mentally capable of making right judgment or to control his impulses due to his head injury."

Dr. Gudeman also testified as an expert on appellant's behalf. Dr. Gudeman stated that appellant's injury damaged the areas of his brain that are responsible

4

for judgment, inhibitions, and certain motor abilities, yet did not affect the areas responsible for emotions. As a result of these injuries, appellant cannot filter out unwanted ideas or stop himself from acting inappropriately.

Dr. Gudeman opined that appellant was unable to formulate the desire or intent to sexually arouse himself or the victims of his molestation. Because full sexual desire implicates the brain's judgment functions, appellant's injuries prevented him from formulating the mental processes necessary for such desire or intent.

Dr. Gudeman met with appellant 29 times. During their visits, appellant never gave a "solid answer" as to what he had done to his nieces. Only 5 to 10 percent of their time was spent discussing appellant's sexual interests. Dr. Gudeman concluded that appellant was "asexual" because he was not motivated to discuss sex, other than to state he was not sexually interested in his wife. The doctor made no further attempt to explore whether appellant had any sexual interest in children. He did not require appellant to undergo neuropsychological testing because he believed that such tests are based on statistics and are not subtle enough for examination of an individual patient.

Dr. Gudeman opined that if appellant had molested his nieces and told them not to tell their parents, he may have believed it was what the people around him wanted him to do. The doctor further opined that appellant's underlying sexual desire is low, although his brain injury damaged his ability to control whatever desires he had.

At the conclusion of the trial, the court found appellant guilty on all charged counts. The court reasoned: "I am convinced that [appellant's] brain injury did not prevent him or interfere with his inability [*sic*] to act willfully, nor did it prevent him or interfere with his ability to form the specific intent required for any of the crimes for which he is charged and convicted. [¶] As argued by the People, if [appellant's] brain injury was causing him to act uncontrollably or without volition, you'd expect the criminal acts to occur in an unplanned manner, out in the open, not with stealth. But it's very clear [appellant] made efforts to commit these offenses in secret. That seems to contradict the suggestion that these were uncontrollable urges. [¶] The fact that [appellant] molested [D.] in the bathroom . . . demonstrates that he not only could control

5

when and where his inappropriate conduct took place, but also that it was planned and not spontaneous. [¶] If [appellant] could not control his behavior, the Court would ask why would he tell [D.] and [M.] not to tell their parents. It's incredulous [*sic*] for the Court to entertain the notion that [appellant's] brain injury would also cause him to tell the girls to keep it a secret. [¶] [Appellant's] brain injury I can't imagine in any way, shape or form would also cause him to call them in an attempt to lure them into further inappropriate conduct." The court also noted: "I did listen to the defense expert's testimony, and I'm not persuaded by it with respect to whether [appellant] could form the requisite intent required for the crimes charged."

## DISCUSSION

Appellant contends the evidence is insufficient to support his conviction for continuous sexual abuse of D. He claims the evidence of his brain damage precluded a finding that his conduct was lewd and lascivious.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) "'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.'" (*Ibid.*) Our review does not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) Reversal is not warranted unless "'. . . upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 288.5, subdivision (a) provides in relevant part that "[a]ny person who either resides in the same house with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066,

6

or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child . . . ."

For purposes of section 288.5, substantial sexual conduct is defined as "penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." (§ 1203.066, subd. (b).) Lewd or lascivious conduct is any act done "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the offender] or the child . . . ." (§ 288, subd. (a).) A conviction under section 288.5 based on substantial sexual conduct is a general intent crime, requiring only a showing that the defendant acted willfully, i.e., intended to engage in the particular conduct. A conviction based on lewd or lascivious conduct is a specific intent crime, which requires the prosecution to prove the defendant intended to commit the act for the purpose of sexual gratification. (*People v. Warner* (2006) 39 Cal.4th 548, 557; *People v. Whitham* (1995) 38 Cal.App.4th 1282, 1292.)

Appellant's attack on the sufficiency of the evidence only challenges the "lewd and lascivious conduct" theory of guilt. Although appellant notes the court as trier of fact concluded that appellant's brain injury did not interfere with his "ability to form the specific intent required for any of the crimes for which he is charged and convicted," the court also found that the injury did not affect is ability "to act willfully[.]" Moreover, the prosecutor argued that appellant was guilty of engaging in both substantial sexual conduct and lewd or lascivious conduct. As the prosecutor stated, the undisputed evidence that appellant touched D.'s vagina on three to five separate occasions was sufficient by itself to convict him under section 288.5 on the theory that he continuously engaged in substantial sexual conduct with the child. (See *People v. Chambless* (1999) 74 Cal.App.4th 773, 782-787, interpreting former Welf. & Inst. Code, § 6600.1 ["[A]ny contact, however slight of the sexual organ of the victim or the offender would be sufficient to qualify as masturbation and in turn as substantial sexual conduct"].)

7

The evidence is also sufficient to support appellant's conviction of continuous sexual abuse of a child on the theory that he engaged in three or more acts of lewd or lascivious conduct.  In arguing otherwise, appellant focuses exclusively on the evidence he offered to prove that his brain injury rendered him incapable of forming the requisite intent to act for the purpose of sexual gratification.  He fails however, to acknowledge the evidence that supports a contrary conclusion.  Most notably, appellant admitted being sexually excited by the fact that his victims were pre-pubescent.  He also admitted knowing that his conduct was wrong, and further demonstrated that knowledge by committing the abuse clandestinely and telling his victims to keep it a secret.  All of this evidence belies the testimony of appellant's psychiatrist, who acknowledged that he and appellant had only briefly discussed appellant's sexual interest.  In light of the discrepancies between appellant's proffered evidence and his own admissions, the court as trier of fact could logically infer that appellant's brain injury did not interfere with his ability to form the requisite intent to sexually abuse D.  Appellant's claim of insufficient evidence accordingly fails.

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.


8

Kevin DeNoce, Judge

Superior Court County of Ventura

_____

Richard C. Gilman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Chung L. Mar, Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.